MARY A. KEEGAN v. MINNEAPOLIS & ST. LOUIS RAILROAD COMPANY.

April 26, 1899.

Nos. 11,506—(58).

**Death by Wrongful Act—Proximate Cause of Disease—Verdict Sustained by Evidence.**

In an action to recover damages for the death of plaintiff's decedent, alleged to have been caused by defendant's negligence, *held*, that the evidence justified the jury in finding that the bodily injury sustained by the deceased was the proximate cause of the disease (articular rheumatism) of which he died.

**New Trial—Disqualification of Juror—Residence.**

Also, that there was no abuse of discretion in denying a motion for a new trial on the ground of the disqualification of one of the jurors because of his nonresidence in the county in which the action was tried.

Action in the district court for Le Sueur county by the administratrix of the estate of James F. Keegan, deceased, to recover $5,000 damages on account of his death. The case was tried before Cadwell, J., and a jury, which rendered a verdict in favor of plaintiff in the amount demanded; and from an order denying a motion for a new trial, defendant appealed. Affirmed.

*Albert E. Clarke*, for appellant.

*M. A. Spooner*, for respondent.

MITCHELL, J.

This was an action to recover damages for the death of plaintiff's decedent, alleged to have been caused by defendant's negligence. On March 30, 1897, the deceased, a passenger on defend-

ant's road, when alighting from the train, stepped into a hole in the station platform, and sprained his left ankle. He was subsequently attacked by articular, or, as commonly known, "inflammatory," rheumatism, and on August 16, 1897, died of what is known in medical parlance as "endocarditis," which means inflammation of the lining membrane of the cavities of the heart. The evidence is conclusive that the rheumatism was the direct and proximate cause of the endocarditis. It would perhaps be more proper to say that the latter is merely a name for the former, when it reaches the membranes surrounding the heart.

It is conceded that the verdict of the jury (which was in favor of the plaintiff) is conclusive that the injury to the ankle of the deceased was caused by the negligence of the defendant. Hence it is liable, if this injury was the proximate cause of the death. In accordance with the decisions of this, as well as of most, if not all, other courts, if the injury proximately caused the rheumatism, then the injury was a proximate cause of the death. The fact that the deceased might have been, for any reason, predisposed to rheumatism, would be immaterial, provided that but for the injury that disease would not have resulted. Bishop v. St. Paul City Ry. Co., 48 Minn. 26, 50 N. W. 927; Miller v. St. Paul City Ry. Co., 66 Minn. 192, 68 N. W. 862. And, if the negligence of the defendant was the proximate cause of the injury, the fact that it could not have reasonably anticipated the particular result which followed, viz. that the injury might produce rheumatism, causing death, is also immaterial. Consequences which follow in an unbroken sequence, without an intervening efficient cause, from the original negligent act, are natural and proximate; and for such consequences the original wrongdoer is responsible, even though he could not have foreseen the particular results which did in fact follow. We had occasion to consider this question in Christianson v. Chicago, St. P., M. & O. Ry. Co., 67 Minn. 94, 69 N. W. 640, and point out the distinction in that respect between actions in tort and actions on contract.

The precise question presented on this appeal is whether there was legally sufficient evidence to justify the jury in finding that

the rheumatism of which the deceased died was directly and proximately caused by the injury to his ankle.

The evidence shows that the deceased was 34 years of age; was in good health at the time of the injury; that he had never been sick, at least during his married life of nearly seven years immediately preceding the accident, except for a short time with the grippe, four years previously; that he had never been troubled with anything like rheumatism until after he received this injury; that his father died at the age of between 60 and 70 of what was supposed to be dyspepsia; that his mother was still living at the age of about 70, and had always been in good health, except that she had suffered somewhat from rheumatism during the last year and a half; also that all of his brothers and sisters were living and in good health. The evidence also tends to show that the injury was quite a severe one, producing severe pain, and causing quite serious swelling of the foot and ankle. A physician was called, who at first bandaged the ankle and applied liniment, but subsequently put it into a plaster of Paris cast, in which it was kept for about ten days. During this time the deceased could not, or at least did not, use his injured foot in walking, but moved about the house on crutches. Some time in April—the exact date does not appear, but apparently in the latter part of the month—articular rheumatism developed itself in the swelling of his right foot and ankle, and soon afterwards of his right hand and wrist, and then of the right elbow, and by the middle of May the swelling sometimes reached to his knees. The disease gradually advanced, until finally, along about the latter part of June, he was compelled to take to his bed, where he remained until his death on August 16.

The evidence does not disclose any apparent cause of the disease, unless it is the injury to his ankle. The deceased was a traveling salesman, and some time about the middle of April, after the sprain had been at least partially cured, he resumed his business trips on the road, using a cane to assist him in walking. He took several of these trips (about six) during the spring and early summer, returning from the last one about June 25, when he took to his bed, as already stated. Each of these trips occupied three or four days, and between them he was frequently confined at home for a time

by his rheumatism, for which he was undergoing medical treatment. Aside from this testimony as to the antecedent health of the deceased and of his relatives, the character of the injury, and the history of the appearance and progress of the rheumatism, about all of which there was practically no dispute, the evidence consisted exclusively of medical expert testimony as to the nature and causes of articular or inflammatory rheumatism, and particularly as to the cause of it in the case of deceased.

Seven physicians were examined as medical experts, two of whom had attended deceased professionally during his illness; but it is not apparent that on the subjects as to which they were called to testify the latter had any advantage over those who did not attend deceased, but who heard the testimony as to the nature of the injury and history of the appearance and progress of the disease. All seemed to agree that articular or inflammatory rheumatism is a blood disease, and is caused by the presence of poison in the blood. Three of them testified that traumatism (which means a bodily injury) is one of the causes of articular rheumatism; that the injury to deceased's ankle was a sufficient cause to produce the disease; and that, in their opinion, it was the cause of it in this case. Two of these accepted or favored the "germ theory" as to the cause of articular rheumatism. They admitted that this theory had never been demonstrated, and that the germ had never been discovered or isolated; that there had been great difference of opinion as to the exact cause of the disease, and that there was still some difference of opinion on the subject, but that the general trend of modern opinion was in favor of the germ theory, as being more consonant with the pathological evidences of the disease itself; that traumatism was generally laid down by the standard medical authorities as one of the common causes of the disease, and that they contained numerous well-authenticated instances where traumatism had been followed by articular rheumatism where there was no apparent cause for the disease other than the injury; and that this accorded with their own professional experience. The third agreed with the other two, except that he adhered to the "lactic-acid" theory as to the origin of the disease, but claimed that germs originated from, and were multiplied by, "the

fermentation that causes lactic acid"; which was a combination of two theories, not approved by any other witness on either side. The theory of the two who accepted the "germ theory" was that the injury did not introduce the germs into the system, but that the dead or injured tissue, resulting from the injury, incited the rapid increase of germs from the seed already in the system.

On the other side, four expert witnesses testified that, in their opinion, there was no connection between the injury and the rheumatism of which the deceased died. None of them testified that traumatism might not cause articular rheumatism, or that it was not given by medical authorities as one of the causes of the disease, but they testified that they had never seen it given by the authorities as one of the causes, and that they had never met with a case in their practice where the disease had followed an injury, except in the case of the deceased. One of them gave it as his opinion that the most frequent exciting cause of the disease was exposure to cold and dampness, but when asked, on cross-examination,

"Suppose a man has never had rheumatism before, and suppose he does receive a personal injury, and you know of no other cause, and there follows after the personal injury an acute articular rheumatism, would you not believe that the injury was the cause of the attack of the rheumatism?" answered, "If I could not find any other cause, I probably should."

Two of the four admitted that "the weight of authority" or "the bulk of the evidence" supported and favored "the germ theory." One of the four favored the "metabolic theory" as to the origin of the disease, by which he meant a derangement of the digestive organs, where elimination and assimilation were not properly carried on, and as a consequence poisonous matter accumulated in the system and entered into the blood. He admitted, however, that, if the "germ theory" was true, he could see how the injury might have produced rheumatism. The fourth, while of the opinion that the disease is caused by an infectious poison in the blood, "did not know about the germ theory," but could not see how the injury could cause the disease, unless it became infected with pus. He admitted, however, that traumatism was given by the authorities as one of the causes of articular rheumatism.

From this general outline of the evidence, it is apparent that much of the expert testimony as to the origin of the disease, and as to the particular way by which, if at all, an injury produces articular rheumatism, consists, not of demonstrated or discovered facts, but mainly of mere theory or opinion, approaching very nearly to mere speculation. The unsatisfactory, as well as dangerous, character of this kind of evidence, is well known. Experts are nowadays often the mere paid advocates or partisans of those who employ and pay them, as much so as the attorneys who conduct the suit. There is hardly anything, not palpably absurd on its face, that cannot now be proved by some so-called "experts." And, in these personal injury cases, so-called "medical experts" can be found who will testify that almost any disease or ailment to which human flesh is heir was, in their opinion, caused by the injury. This evil has become so great in the administration of justice as to attract the serious consideration of courts and legislatures. These suggestions are general, and not made with reference to anything peculiar in the present case.

But, conceding that all the expert testimony as to the "germ theory," or any other theory, and as to the precise manner a bodily injury produces articular rheumatism, should be disregarded, yet we think the evidence in this case, based upon both the medical authorities and upon the professional experience of some of the witnesses, is sufficient to justify the conclusion that articular rheumatism so often follows personal injuries that this is not a mere coincidence, but that oftentimes the injury is the exciting cause of the disease. When this is reinforced by the evidence that the deceased was never previously attacked by the disease; that it developed in such a severe form so soon after the injury, without any other apparent cause,—we think that the jury was justified in concluding that the latter was the cause of the former, regardless of the truth or falsity of many of the particular theories of the experts. At least, we do not think that we would be justified in holding that the evidence, although by no means of the most satisfactory or convincing character, did not justify the verdict.

2. When the jury was being impaneled, defendant's counsel inquired of one of the jurors where he resided, to which he replied

in the city of New Prague. Counsel, supposing that New Prague was wholly within the county of Le Sueur, in which the action was being tried, made no further inquiry, but accepted the juror. That city, however, is partly in Le Sueur county, and partly in the adjoining county of Scott (Sp. Laws 1891, c. 46), and it turns out that the juror was a resident of that part of New Prague which is in Scott county. One of the grounds upon which a new trial was asked was the disqualification of this juror. There was clearly no abuse of discretion in refusing a new trial on this ground, especially as the disqualification of the juror did not go to either his intelligence or his impartiality. State v. Durnam, 73 Minn. 150, 75 N. W. 1127.

Order affirmed.