797 F.2d 370
 55 USLW 2081, 1986-1 Trade Cases 67,189
 OLYMPIA EQUIPMENT LEASING COMPANY, ALFCO Telecommunications
Company, and Paula Jeanne Feldman, personal
representative of the estate of Abraham
Feldman, Plaintiffs-Appellees,
v.
WESTERN UNION TELEGRAPH COMPANY, Defendant-Appellant.
 No. 85-3150.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 5, 1986.
Decided July 18, 1986.
Rehearing and Rehearing En Banc Denied Oct. 6, 1986.
 
 Andrew Hartzell, Jr., Debevoise & Plimpton, New York City, for defendant-appellant.
 Paul E. Slater, Sperling Slater & Spitz, Chicago, Ill., for plaintiffs-appellees.
 Before BAUER, POSNER and FLAUM, Circuit Judges.
 POSNER, Circuit Judge.
 
 
 1
 The plaintiffs, affiliated companies (now defunct) and their assignee--we shall refer to the plaintiffs collectively as "Olympia"--brought this suit in 1977 against Western Union Telegraph Company, seeking damages for monopolization and attempted monopolization under section 2 of the Sherman Act, 15 U.S.C. Sec. 2, and for breach of contract under state law. The complaint also contained a count under section 1 of the Sherman Act, charging a conspiracy between the defendant and its parent corporation, but this count was dropped before trial, presumably because of the Supreme Court's decision abolishing the doctrine of intra-enterprise conspiracy. Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984).
 
 
 2
 Trial was to a jury, which awarded (after remittitur) $12 million in antitrust damages and alternatively $12 million for breach of contract. The antitrust damages were trebled as required by law, making the total judgment $36 million plus a reasonable attorney's fee. Western Union appeals. Its principal argument is that the judge should have granted its motion for judgment notwithstanding the verdict (a motion renewing Western Union's motions for directed verdict made and denied at the close of the plaintiff's case in chief and again at the close of all the evidence) on both the antitrust and the contract counts; in other words, the case should never have gone to the jury, because on the evidence presented at trial no rational finder of facts could have found either an antitrust violation or a breach of contract. Western Union also argues that the award of damages was in any event grossly excessive.
 
 
 3
 Although the trial lasted more than six weeks and produced the usual mountain of testimony and exhibits, the facts relevant to this appeal are simple. We state them as favorably to Olympia as the record permits, in view of the jury's verdict. As a natural evolution from its historic telegraph service, Western Union created "Telex," a switched message transmission service provided over communications lines owned or leased by Western Union and routed through exchanges owned by it. Western Union runs an access line from its local exchange to the subscriber's premises, where the line is hooked up to a terminal. The subscriber to the service can dial any other subscriber and, when connection is made, can transmit messages from his terminal to the other subscriber's terminal. Thus telex service is like telephone service except that the communications transmitted are messages rather than voice communications. Until the 1970s Western Union required its subscribers to lease their telex terminals from it. It bought these terminals from the Teletype Corporation; indeed the earliest and still a common type of telex terminal is the familiar teletypewriter. The price of telex service--a price regulated by the Federal Communications Commission--was a "bundled" price, meaning that it covered both telex service and the telex terminal. In 1971 Western Union bought from AT & T a service similar to and competitive with telex--TWX. We shall refer to the two services jointly as "telex." For background and approval of the acquisition see Western Union Telegraph Co., 24 F.C.C.2d 664 (1970).
 
 
 4
 Beginning with the Carterfone decision in 1968, the Federal Communications Commission opened the telephone terminal equipment market, historically dominated by AT & T (which like Western Union required its subscribers to lease their terminal equipment from it), to competition from independent providers of such equipment. See Use of the Carterfone Device for Message Toll Telephone Service, 13 F.C.C.2d 420 (1968); Illinois Bell Tel. Co. v. FCC, 740 F.2d 465, 468 (7th Cir.1984). Required to do the same in the telex terminal equipment market as a condition of being allowed to acquire TWX (see Western Union Telegraph Co., supra, 24 F.C.C.2d at 676; Western Union Telegraph Co., 39 F.C.C.2d 977, 978 (1973)), and in any event wanting to sell its terminals in order to raise capital to buy communications satellites for the transmission leg of its telex and other services, Western Union in 1973 announced that it was opening the telex terminal market to competition. It unbundled its pricing of service and equipment, told its subscribers they could cancel their existing leases of terminal equipment on 30 days notice and lease or buy such equipment from anyone they pleased, and told prospective vendors of such equipment that it would put them on a list which its salesmen would give new subscribers to telex service who were seeking terminals. Western Union even held a seminar for prospective vendors to encourage entry into the equipment market. Finally, it told its salesmen to try to sell its "installed base" of terminals--the 90,000 odd terminals that it owned and had leased to subscribers--to the lessees.
 
 
 5
 Since Western Union did not plan to buy additional telex terminals, the effect of this series of steps was to put Western Union on the road to withdrawing from the telex terminal market, the withdrawal to be completed when its last terminal was sold to the lessee of the terminal. Although the FCC had insisted that Western Union open the telex terminal market to competition as a condition of being allowed to buy TWX from AT & T, it never suggested that Western Union should leave the market, whether quickly or slowly. Western Union's decision to leave was voluntary.
 
 
 6
 Olympia, formed in 1975 to take advantage of the opportunity that Western Union had opened up for independent providers of telex terminals, bought terminals from Teletype Corporation just as Western Union had done. To obtain customers for its terminals Olympia relied on referrals from Western Union's salesmen--for Olympia had no sales force of its own, being a skeletal enterprise created largely for tax reasons. And yet for a period of several months in 1975, when Western Union's schedule of sales commissions encouraged its salesmen to push independently supplied terminals and when these salesmen were routinely showing the list of independent vendors to new telex subscribers, Olympia throve, installing 1,800 terminals--20 percent of all the telex terminals installed during this period.
 
 
 7
 Then the roof caved in. Western Union decided that it was liquidating its own inventory of telex terminals too slowly. It changed the schedule of commissions to encourage its salesmen to sell more Western Union terminals, and there is evidence that it also told the salesmen to stop showing the list of vendors to its subscribers. Between August and October 1975, sales and leases of terminals by Western Union to new customers rose from about 500 a month to 1,300 while Olympia's new leases fell from 425 to zero and sales and leases by other vendors fell from 1,300 to 500. Vendors who had their own sales forces were able to hang on, as these figures show. Olympia, which previously had depended entirely on referrals by Western Union's salesmen, tried to survive by hiring its own salesmen to solicit lessees of Western Union terminals. It hoped to persuade some of the lessees to cancel their leases. This effort to compete against Western Union's installed base enraged Western Union, which in the most dramatic document in the case announced that "these turkeys ... ought to be flushed." But nothing was done, or had to be done. Olympia's effort failed without any additional measures by Western Union, and Olympia went out of business in 1976.
 
 
 8
 On these facts, could a rational trier of fact find that Olympia was a victim of monopolization? The offense of monopolization under section 2 of the Sherman Act requires proof of monopoly power (the power to raise prices without losing so much business that the price increase is unprofitable, see, e.g., Ball Memorial Hospital, Inc. v. Mutual Hospital Ins., Inc., 784 F.2d 1325, 1335 (7th Cir.1986)) plus conduct designed to maintain or enhance that power improperly. See, e.g., United States v. Grinnell Corp., 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1703-04, 16 L.Ed.2d 778 (1966); Aspen Skiing Co. v. Aspen Highlands Skiing Corp., --- U.S. ----, 105 S.Ct. 2847, 2854 n. 19, 86 L.Ed.2d 467 (1985). Olympia's complaint also charges attempted monopolization, but in a case such as this where the plaintiff presents (as we shall see) adequate evidence of monopoly power, he can get no mileage out of charging attempted as well as completed monopolization. Conduct lawful for a monopolist is lawful for a firm attempting to become a monopolist. 3 Areeda & Turner, Antitrust Law p 828a (1978).
 
 
 9
 So far as terminal equipment is concerned, viewed separately from telex service, it seems inconceivable that Western Union could have had monopoly power in 1975. Then as now a vast array of terminals was available to telex subscribers, of which the 90,000 terminals owned by Western Union were only a tiny fraction. Western Union was not even a manufacturer of terminals. It was a jobber for Teletype Corporation; and but for Western Union's position as sole provider of telex service--an essential qualification, as we are about to see--anyone else could have bought the same terminals from Teletype Corporation and sold them in competition with Western Union.
 
 
 10
 But if Western Union had monopoly power over telex service, it could use that power to curtail competition in the complementary equipment market. Although Western Union was the sole provider of telex service after acquiring TWX in 1971, this gave it monopoly power only if there were no close substitutes for telex. Almost certainly there were. Even as far back as 1968--the Dark Ages so far as competition in the telecommunications industry is concerned--President Johnson's Task Force on Communications Policy, which recommended that Western Union be allowed to buy TWX, opined that Western Union would not obtain monopoly power from the acquisition, owing to the ready ability of consumers to substitute other services provided by AT & T. President's Task Force on Communications Policy, Final Report, ch. 6, pp. 47-49 (GPO Dec. 7, 1968). But the report of a government commission is not necessarily conclusive on the state of competition. Monopoly power is, as Western Union concedes, a question of fact on which a jury is allowed to disagree with governmental reports and other secondary materials. On the record compiled in this case, which included evidence that even a steep increase in the price of telex service would not have caused many subscribers to switch to substitute services (thus implying a low elasticity of demand for telex service, and therefore monopoly power for the firm that controlled the service--Western Union), a rational jury could have found that Western Union had monopoly power in the market for telex service; so we must repress our skepticism.
 
 
 11
 But the bare fact that a firm has monopoly power in Market X does not imply that it will have an incentive to obtain monopoly power over Y, an input into X. In general a monopolist like any other firm wants to minimize its input costs; the lower those costs are, the greater the monopoly profits it will be able to make. Therefore the rational monopolist will usually want his input markets to be competitive, for competition usually will minimize the costs that he has to pay for his inputs. There are, however, special circumstances in which a rational monopolist may want to restrict competition in an input market; as it happens, one of those circumstances is where the monopolist's rates are regulated. Western Union's monopoly of telex service was a regulated monopoly, and a regulated monopolist may have an incentive to project its monopoly into related but unregulated markets. Illinois Bell Tel. Co. v. FCC, supra, 740 F.2d at 471-72; Indianapolis Airport Authority v. American Airlines, Inc., 733 F.2d 1262, 1267-69 (7th Cir.1984). The FCC regulates Western Union's telex rates but not--not directly anyway--its equipment charges. Western Union might have had an incentive to insist that telex subscribers lease their terminal equipment from it, because that might enable it to smuggle into the terminal component of its rates some of the monopoly profits from telex service itself--profits the regulators would otherwise force it to pass on to the ratepayers in the form of lower rates for telex service.
 
 
 12
 Hence if Western Union had tried to obstruct the entry of independent providers of telex terminal equipment, its conduct might very well be viewed as an abuse of its monopoly of telex service. Similar conduct by AT & T was so viewed in Litton Systems, Inc. v. AT & T, 700 F.2d 785, 798-800 (2d Cir.1983). Notice, though, that the relevant market is not terminal equipment. Western Union started with a monopoly of telex terminal equipment yet had no monopoly power in that market apart from that derived from its monopoly of telex service--which further shows that the focus of concern should be the service, not the equipment, market. The relevant market, so far as monopoly power is concerned, thus is telex service, where Western Union did have monopoly power (or so a rational jury could find), power it could use to sew up the market for a complementary product such as telex terminals. If, to maximize its profits in its monopoly market, a monopolist restricts competition in a related market, its conduct is actionable in a suit by a firm that is the target of the abusive practice. See Grip-Pak, Inc. v. Illinois Tool Works, Inc., 694 F.2d 466, 474 (7th Cir.1982).
 
 
 13
 Issues of market definition and market power, however, are not critical as we view the case. Not the possession, but the abuse, of monopoly power violates section 2. And far from abusing any monopoly power it may have had, by excluding independent providers of terminal equipment from selling to its telex customers, Western Union encouraged the entry of independent providers. It did this by unbundling its telex prices, by shortening its lease terms, by ceasing to buy additional terminals, by creating a sales commission structure that encouraged its salesmen to push equipment supplied by independent providers, and by putting the names of those providers on a list for its salesmen to show new telex subscribers. Obviously none of this conduct violated the antitrust laws. The alleged violation came when, having created and nurtured new competition, Western Union stopped helping the new competitors because it found it could not liquidate its terminal inventory as rapidly as it had hoped to be able to do.
 
 
 14
 We are cited to no case where an antitrust violation has been found on such facts. The lack of precedent is not surprising. A firm that voluntarily encourages new competition in a tributary market should not be penalized by being made to pay damages under the antitrust laws. Olympia does not argue that Western Union was under any antitrust obligation to take any of the steps (other than unbundling the price of telex service and permitting cancellation of its leases) that it took to facilitate competition in the telex terminal market. The FCC required Western Union to allow competition in this market; it did not require Western Union to foster competition by subsidizing its competitors' selling costs. If Western Union had known that by taking steps to promote competition it would be laying itself open to an antitrust suit that might jeopardize its shaky solvency (as this suit has done, see Olympia Equipment Leasing Co. v. Western Union Tel. Co., 786 F.2d 794 (7th Cir.1986)), it probably would not have taken them. To uphold the district court's judgment would thus undermine the objectives of antitrust law.
 
 
 15
 Opinion about the offense of monopolization has undergone an evolution. Forty years ago it was thought that even a firm with a lawful monopoly (there is no suggestion that Western Union's monopoly of telex service is unlawful) could not be allowed to defend its monopoly against would-be competitors by tactics otherwise legitimate; it had to exercise special restraint--perhaps, indeed, had to hold its prices high, to encourage new entry. So Alcoa was condemned as a monopolist because it had assiduously created enough productive capacity to supply all new increments of demand for aluminum; it would not have been condemned if by keeping its prices high it had kept demand down to a level that it could supply without increasing its capacity. See United States v. Aluminum Co. of America, 148 F.2d 416, 430-31 (2d Cir.1945) (L. Hand, J.). Later, as the emphasis of antitrust policy shifted from the protection of competition as a process of rivalry to the protection of competition as a means of promoting economic efficiency, see, e.g., Broadcast Music, Inc. v. Columbia Broadcasting System, 441 U.S. 1, 19-20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979); Reiter v. Sonotone Corp., 442 U.S. 330, 343, 99 S.Ct. 2326, 2333, 60 L.Ed.2d 931 (1979); Ball Memorial Hospital, Inc. v. Mutual Hospital Ins., Inc., supra, 784 F.2d at 1338; In re Wheat Rail Freight Rate Antitrust Litigation, 759 F.2d 1305, 1315-16 (7th Cir.1985); Brunswick Corp. v. Riegel Textile Corp., 752 F.2d 261, 266-67 (7th Cir.1984); Products Liability Ins. Agency, Inc. v. Crum & Forster Ins. Cos., 682 F.2d 660, 663-64 (7th Cir.1982); Rothery Storage & Van Co. v. Atlas Van Lines, Inc., 792 F.2d 210, 227-29 (D.C. Cir.1986), it became recognized that the lawful monopolist should be free to compete like everyone else; otherwise the antitrust laws would be holding an umbrella over inefficient competitors. "A monopolist, no less than any other competitor, is permitted and indeed encouraged to compete aggressively on the merits...." Foremost Pro Color, Inc. v. Eastman Kodak Co., 703 F.2d 534, 544 (9th Cir.1983). With Judge Hand's opinion in Alcoa compare the approach of his successors in Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 274, 276, 287 (2d Cir.1979).
 
 
 16
 Today it is clear that a firm with lawful monopoly power has no general duty to help its competitors, whether by holding a price umbrella over their heads or by otherwise pulling its competitive punches. See, e.g., MCI Communications Corp. v. AT & T, 708 F.2d 1081, 1149 (7th Cir.1983); Catlin v. Washington Energy Co., 791 F.2d 1343 (9th Cir.1986). "There is a difference between positive and negative duties, and the antitrust laws, like other legal doctrines sounding in tort, have generally been understood to impose only the latter." USM Corp. v. SPS Technologies, Inc., 694 F.2d 505, 512-13 (7th Cir.1982). So if a firm went to a monopolist and said, "Please--for the sake of competition--give me a loan so I can compete with you and make this a competitive market," and it was turned down, it could not invoke the Sherman Act. A monopolist has no duty to reduce its prices in order to help consumers, Berkey Photo, Inc. v. Eastman Kodak Co., supra, 603 F.2d at 294, and no duty to extend a helping hand to new entrants; thus IBM "was under no duty to help CalComp or other peripheral equipment manufacturers survive or expand. IBM need not have provided its rivals with disk products to examine and copy...." California Computer Products, Inc. v. IBM, 613 F.2d 727, 744 (9th Cir.1979) (citation omitted). Berkey, Foremost, and other cases make clear that a monopolist has no duty to disclose its plans to rivals in order to help the rivals compete with it.
 
 
 17
 If a monopolist does extend a helping hand, though not required to do so, and later withdraws it as happened in this case, does he incur antitrust liability? We think not. Conceivably he may be liable in tort or contract law, under theories of equitable or promissory estoppel or implied contract (of which more shortly), or by analogy to the common law tort rule that though there is no duty to help a bystander in distress, once help is extended it may not be withdrawn, at least if the effect is to make the bystander's rescue by someone else less likely. See, e.g., Jackson v. City of Joliet, 715 F.2d 1200, 1202 (7th Cir.1983). But the controlling consideration in an antitrust case is antitrust policy rather than common law analogies. Since Western Union had no duty to encourage the entry of new firms into the equipment market, the law would be perverse if it made Western Union's encouraging gestures the fulcrum of an antitrust violation. Then no firm would dare to attempt a graceful exit from a market in which it was a major seller. We can imagine, though with difficulty, an argument that a monopolist might decide to entice new firms into its market only to destroy them and so deter other firms from trying to enter. But no such diabolical scheme is ascribed to Western Union, which undoubtedly was sincere in inviting new vendors into the market and in wanting to leave the market as soon as it liquidated its inventory of terminals bought from Teletype Corporation and leased to its subscribers.
 
 
 18
 Some cases hold, however, that a firm which controls a facility essential to its competitors may be guilty of monopolization if it refuses to allow them access to the facility. We accept the authority of these cases absolutely. They are well illustrated by Otter Tail Power Co. v. United States, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), where a wholesale supplier of electricity refused to supply electric power to a power system that competed with it in the retail electrical power market and had no other source of supply. It might seem that if a monopolist's refusal to sell his products or services to a competitor can thus be actionable under antitrust law, it must mean that monopolists sometimes do have a duty to help their competitors and that the cases which deny this proposition are wrong. But the monopolistic-refusal-to-deal cases qualify rather than refute the no-duty-to-help-competitors cases. If a competitor is also a customer his relationship to the monopolist is not only a competitive one. The monopoly supplier who retaliates against customers who have the temerity to compete with him, by cutting such customers off, is severing a collateral relationship in order to discourage competition.
 
 
 19
 The present case would be an essential-facility case if Western Union had refused to supply telex service to a customer who got his terminal equipment from Olympia rather than from it, or if Olympia were a competing supplier of telex service who, like the specialized common carriers in the long-distance telephone market, depended on the owner of the local exchanges (here Western Union) to complete its service. Neither condition is satisfied. The essential feature of the refusal-to-deal cases--a monopoly supplier's discriminating against a customer because the customer has decided to compete with it--is missing here. Western Union did not withhold from one member of the public a service offered to the rest; nor was it in the habit of supplying vendor lists free of charge, and balked only when the recipient turned out to be a competitor. From the outset the vendor list was a form of special assistance rendered gratis to competitors, and there is no more duty to give or continue such assistance than there is to lend money to a competitor. Conceivably a firm in the business of making loans may not be allowed to withhold a loan from a competitor (if the lender has monopoly power), but clearly a firm that is not in that business is not required to lend money to a competitor merely because the loan would increase competition.
 
 
 20
 Aspen Skiing Co. v. Aspen Highlands Skiing Corp., supra, goes the furthest of any case we know toward imposing (more precisely, allowing a jury to impose) a duty under antitrust law to help a competitor; and as a recent decision by the Supreme Court it requires our most careful and respectful consideration. The Aspen Skiing Company owned three of the four mountains that make up the Aspen skiing complex. Aspen Highlands Skiing Corporation owned the fourth. The two companies had offered their customers a joint ticket, usable on all four mountains, and the suit arose because Aspen Skiing Company terminated this cooperative arrangement. The Supreme Court found that for the convenience of customers an owner of a ski mountain in a multi-mountain skiing area normally would want to offer a ski ticket usable on any of the mountains. The joint ticket had originated at a time when there was competition among the different ski mountains at Aspen, and similar tickets were offered at other multi-mountain ski areas. 105 S.Ct. at 2858. In other words, competition required some cooperation among competitors. Aspen Highlands is not a conventional monopoly refusal-to-deal case like Otter Tail because Aspen Highlands was never a customer of Aspen Skiing Company; the skiers are the customers. But it is like the essential-facility cases in that the plaintiff could not compete with the defendant without being able to offer its customers access to the defendant's larger facilities.
 
 
 21
 Olympia analogizes access to all the major mountains at Aspen to Western Union's vendor list, and argues that just as Aspen Highlands could not survive without access to the mountains so Olympia could not survive without the list. The analogy lacks not only plausibility but also evidentiary support. There is no evidence that suppliers of telecommunications equipment customarily provide their customers with lists containing the names of competing suppliers or that without such lists a new entrant cannot compete with established firms. Although some customers of Western Union may not have known about alternative vendors, nothing prevented those vendors from acquainting the customers with their existence. Virtually by definition, a consumer will not know of the existence of a brand-new firm; but this point is not usually understood to imply a duty in existing firms to tell their customers about the new firm, even if the existing firms have monopoly power. Brand-new firms are expected to make their own way in the market, by advertising or other means of promotion. Particularly where, as in this case, the consumers are business firms rather than individuals, a new competitor should have no difficulty informing consumers of its existence.
 
 
 22
 Aspen Highlands could not acquire three more mountains in the Aspen area in order to be able to compete more effectively with the Aspen Skiing Company but Olympia could and did hire salesmen to substitute for the Western Union sales force that had been helping it. If Western Union had tried to prevent Olympia from making the substitution it would have been guilty of exclusionary conduct. But Olympia had no right under antitrust law to take a free ride on its competitor's sales force. You cannot conscript your competitor's salesmen to sell your product even if the competitor has monopoly power and you are a struggling new entrant. Advertising a competitor's products free of charge is not a form of cooperation commonly found in competitive markets; it is the antithesis of competition. It is not found in the telecommunications industry except when required by regulatory fiat, see, e.g., North American Telecommunications Ass'n v. FCC, 772 F.2d 1282, 1290 (7th Cir.1985), and it did not originate in the telex market at a time when that market was competitive but at a time when Western Union, having acquired TWX from AT & T, had (the jury found) a monopoly of that market.
 
 
 23
 Olympia cites Aspen Highlands for the proposition that if a firm with monopoly power cannot give a good business justification for not cooperating with a competitor, its refusal to cooperate violates antitrust law. Conjoined with other evidence, lack of business justification may indicate probable anticompetitive effect. See 105 S.Ct. at 2859-60. But there is a clear business justification in this case: Western Union wanted to liquidate its supply of telex terminals faster, so it stopped promoting a competitor's supply. The main economic objection to monopoly is that the monopolist restricts output compared to what it would be under competition. The monopolist cannot be faulted for wanting to sell more output unless he is engaged in some predatory or exclusionary scheme the long-run effect of which may be to restrict output (perhaps in a different market, as in a case where the regulated monopolist takes over a related market in an effort to evade profit regulation and thus keep profits up, and output down, in the monopoly market). There is no such scheme here; Western Union's long-run design is to get out of the telex terminal market. The defendant in Aspen Highlands discontinued a service that its customers valued, thus forgoing normal competitive benefits in the hope (so the jury found at any rate) of reaping long-term anticompetitive gains; there is no prospect of such gains in the unusual case--which is the present case--of a monopolist who is voluntarily relinquishing his monopoly position.
 
 
 24
 Although there is evidence that Olympia's terminals were newer and cheaper than Western Union's and that Western Union withdrew the list of vendors in order to help push its own inferior product, such evidence has little significance; the free market and not a judge or a jury decides whose products are inferior. Merely to say that Olympia's terminals were newer and cheaper is not to say that consumers should have valued them more than the terminals supplied by an established firm such as Western Union. Although a monopolist can (like the rest of us) be expected to act selfishly, and in some cases consumers will be hurt, in the long run they will be hurt more if juries are allowed to burden a monopolist with a positive duty of assisting competitors. As we said earlier, if Western Union had known that by distributing a list of rival vendors it was undertaking a journey from which there could be no turning back--a journey it could not even interrupt momentarily--it would have been foolish to have embarked. Pertinent therefore is the Supreme Court's recent warning about the possible anticompetitive consequences of allowing a jury to infer monopolization from behavior that in most cases is competitive. See Matsushita Electric Industrial Co. v. Zenith Radio Corp., --- U.S. ---, 106 S.Ct. 1348, 1360, 89 L.Ed.2d 538 (1986).
 
 
 25
 The present case is fundamentally different from the other telecommunications antitrust cases in recent years. In cases such as Litton, AT & T was found to have obstructed its competitors in the market for terminal equipment by requiring expensive and unnecessary interfaces between the subscriber's access line and the terminal equipment bought by the subscriber from sources other than AT & T. Like AT & T, Western Union was required by the FCC to open a terminal market that it had previously controlled to competition. But there the resemblance ends. All Western Union did in this case to "obstruct" Olympia from competing with it in the sale or lease of telex terminal equipment was to stop making referrals to Olympia. That was not obstruction (or as Olympia sometimes calls it "monopoly leveraging"), for Olympia remained free to compete by sending salesmen to call on Western Union's subscribers. This was not an illusory freedom. Firms better established than Olympia--firms that had their own sales forces--weathered the withdrawal of the vendor list. Western Union stopped helping Olympia but did not hinder it. It had no duty to use its salesmen at its expense to do Olympia's selling merely because Olympia was too weak to compete successfully against Western Union with a sales force of its own. Refusing to act as your competitor's sales agent is not an unnatural practice engaged in only by firms bent on monopolization.
 
 
 26
 The Aspen Highlands decision, on which Olympia naturally rests the main weight of its argument, is narrowly written. If it stands for any principle that goes beyond its unusual facts, it is that a monopolist may be guilty of monopolization if it refuses to cooperate with a competitor in circumstances where some cooperation is indispensable to effective competition. No reasonable finder of fact could have found this factual premise satisfied in this case. The experience of the other independent vendors, competitors of Olympia and Western Electric, shows--what is anyway obvious--that Olympia did not have to use Western Union's sales force (gratis) in order to compete with Western Union.
 
 
 27
 We add, what has become an antitrust commonplace, that if conduct is not objectively anticompetitive the fact that it was motivated by hostility to competitors ("these turkeys") is irrelevant. See, e.g., Ball Memorial Hospital, Inc. v. Mutual Hospital Ins., Inc., supra, 784 F.2d at 1338-39. The importance of intent in such fields as tort and criminal law makes it natural to suppose that it should play an important role in antitrust law as well, for an antitrust violation is a statutory tort. But there is an insoluble ambiguity about anticompetitive intent that is not encountered in the ordinary tort case. If A strikes B deliberately, we are entitled to infer, first, that A's act was more dangerous than if the blow had been accidental (you are more likely to hurt someone if you are trying to hurt him than if you are trying, however ineptly, to avoid hurting him, as in the typical accident case), and, second, that the cost of avoidance to the injurer would have been less than if the blow had been accidental; indeed, the cost of forebearing to commit an act of deliberate aggression is negative, because the act requires effort. Similar inferences would be possible in antitrust cases if the purpose of antitrust law were to protect the prosperity or solvency (corresponding to the bodily integrity of potential tort victims) of competitors, but it is not. Competition, which is always deliberate, has never been a tort, intentional or otherwise. See Keeble v. Hickeringill, 11 East. 574, 103 Eng.Rep. 1127 (K.B. 1706 or 1707). If firm A through lower prices or a better or more dependable product succeeds in driving competitor B out of business, society is better off, unlike the case where A and B are individuals and A kills B for B's money. In both cases the "aggressor" seeks to transfer his victim's wealth to himself, but in the first case we applaud the result because society as a whole benefits from the competitive process. That Western Union wanted to "flush these turkeys" tells us nothing about the lawfulness of its conduct.
 
 
 28
 Most businessmen don't like their competitors, or for that matter competition. They want to make as much money as possible and getting a monopoly is one way of making a lot of money. That is fine, however, so long as they do not use methods calculated to make consumers worse off in the long run. Consumers would be worse off if a firm with monopoly power had a duty to extend positive assistance to new entrants, or having extended it voluntarily a duty to continue it indefinitely. The imposition of such a duty would make firms that possessed or might be thought to possess monopoly power, however laudably obtained, timid about relinquishing that power or, having done so, timid about competing with new entrants. The question therefore is not whether Western Union withdrew the vendor list in order to make money at the expense of Olympia, which of course it did, but whether such withdrawal was an objectively anticompetitive act. It was not, once the basic premise that monopolists are not required to help their competitors, but need only refrain from anticompetitive acts such as denial of access to essential facilities, is granted.
 
 
 29
 We turn now to Olympia's contract claim, which the district court, at Olympia's urging, held (and we shall assume) is governed by the contract law of New Jersey. The claim is this: Western Union's announcement that it would tell its salesmen to show new telex subscribers a list of independent providers, coupled with Western Union's active and continuous encouragement of these providers, amounted to an offer to prospective providers which Olympia accepted by marketing terminal equipment to telex subscribers, and its acceptance created a binding contract that Western Union broke by ceasing to show the list. This sounds like a straightforward application of the principle of the unilateral contract (the contract that is accepted by performance rather than communication), on which see Association Group Life, Inc. v. Catholic War Veterans, 120 N.J.Super. 85, 95, 293 A.2d 408, 413 (1971), modified, 61 N.J. 150, 293 A.2d 382 (1972) (per curiam)--until one reflects on its implications. Many firms make products that are complementary to other products, as a screw is complementary to a screwdriver, tires to an automobile, and telecommunications terminal equipment to telecommunications service. The provider of one complement will often take steps to encourage other firms to provide the other complement, as without the complement his own product may be worthless to the consumer. On the theory advanced by Olympia in this case, every time a firm does this it invites a breach of contract suit and judgment for consequential damages ($30 million worth, the jury thought in this case), should the firm later retract its encouraging words. Suppose Western Union had merely said that it hoped other firms would start selling terminal equipment to its subscribers, but later it changed its mind and started pushing its own equipment aggressively, through deep but lawful price cuts. Would this be a breach of contract? We think not and are pointed to no authority that it would be.
 
 
 30
 Western Union did state to prospective vendors that "at the time of the access line sales by Western Union salesmen, salesman will furnish customers [a] list of retailers," but we do not think that a reasonable finder of fact, considering this statement in light of all of the evidence, could conclude that by this statement Western Union had committed itself on pain of legal sanction to keep on furnishing the vendor list to its customers indefinitely if Olympia "accepted" the "offer" by selling terminal equipment to Western Union's subscribers. Promotional materials that Olympia gave prospective investors disclaimed any commitment by Western Union to conform to a rule or policy of encouraging new entry into the terminal equipment market. Instead these materials warned prospective investors that if Western Union's policy changed they could lose their investment. A similar warning might have been necessary even if Olympia had thought it had a contractual commitment. But there is a difference between saying that one thinks one has contractual protection but can't be sure and anyway a suit for breach of contract is a protracted and expensive undertaking, and representing--as Olympia represented to prospective investors--that one is entirely at the mercy of another firm's unknown and unpredictable future marketing decisions.
 
 
 31
 We do not want to put all of our weight on statements made to prospective investors in Olympia; prudent firms will bend over backwards to avoid painting too rosy a picture of the enterprise's prospects and so inviting a suit for fraud if the enterprise falters, as it did here. The more important point is that Olympia was a sophisticated outfit that knew the difference between "a legally binding promise" and "a hopeful encouragement, sounding only in prophecy." Hall v. First Nat'l Bank, 173 Mass. 16, 19, 53 N.E. 154, 155 (1899) (Holmes, C.J.). See also Beverage Distributors, Inc. v. Olympia Brewing Co., 440 F.2d 21, 29-30 (9th Cir.1971). Olympia could have negotiated for contractual protection but did not, doubtless realizing that Western Union would not commit itself to protecting Olympia's market. If it is inconceivable that Western Union would have signed an express contract, it is unreasonable to infer an implied contract.
 
 
 32
 "An offer, to constitute a contract, must be one which is intended of itself to create legal relations on acceptance. The agreement must purport to produce a legally binding result, or, to put it in another form, the intention of the parties must refer to legal relations. It must contemplate the assumption of legal rights and duties. An offer is a statement by the offeror of what he will give in return for some promise or act of the offeree. As the offeror's statement necessarily looks to the future, it must always be promissory in terms. An expression of desire or hope is not of itself an offer which will become a contract upon acceptance by the adversary party." Broad Street Nat'l Bank v. Collier, 112 N.J.L. 41, 43-44, 169 A. 552, 553 (Sup.Ct.1933), aff'd, 113 N.J.L. 303, 174 A. 900 (N.J.1934) (per curiam) (citations omitted). See also Trustees of First Presbyterian Church v. Howard Co. Jewelers, 12 N.J. 410, 413-14, 97 A.2d 144, 146 (1953). The quoted words could have been written with this case in mind. Western Union used no promissory language; on the significance of this omission see Farnsworth, Contracts Sec. 3.3 at p. 108 (1982). It did not even say, "If you providers enter the market, we will put you on a vendors' list that our salesmen will show new subscribers to telex service." It gave no indication that it intended to be legally bound should its hope that firms like Olympia would enter the terminal equipment market be realized. The case resembles an example given in the first Restatement of Contracts Sec. 25, illustration 4 (1932), of a statement that is not an offer: "A writes to B, 'I am eager to sell my house. I wish to get $20,000 for it.' "
 
 
 33
 An additional consideration is the lack of specificity of Western Union's "offer." See Malaker Corp. Stockholders Protective Comm. v. First Jersey Nat'l Bank, 163 N.J.Super. 463, 474-75, 395 A.2d 222, 228 (1978); Simpson, Handbook of the Law of Contracts 16 (2d ed. 1965). No terms are stated. As interpreted by Olympia, Western Union was committing itself to assist new entrants in the terminal equipment market indefinitely and regardless of changes in competitive conditions or even customer acceptance of the entrants' service. This is hardly plausible; and a court asked to enforce the "contract" between the parties would have no guidance in filling in realistic terms. This is not a case of an existing contractual relationship, where the court is merely asked to fill in and enforce an omitted but reasonably implied term. See Bak-A-Lum Corp. v. Aloca Bldg. Products, Inc., 69 N.J. 123, 351 A.2d 349 (1976). The relationship created by Western Union's invitations to the vendors was so nebulous that it would be impossible for a court to imply the conditions or duration of the "offer." If Olympia wanted the security of a contract, it should have negotiated one, not asked a court to write one for it after the fact.
 
 
 34
 Olympia does not argue that it can recover damages on a noncontractual common law theory such as equitable estoppel, even though misrepresentations that it accuses Western Union of having made are relevant if at all only to equitable estoppel, and not to whether there was an offer. Nor does Olympia argue promissory estoppel, though as we noted recently the requirements for proving a promise on which a case of promissory estoppel can be based are less stringent than those for proving an offer. Goldstick v. ICM Realty, 788 F.2d 456, 461-63 (7th Cir.1986).
 
 
 35
 Although Olympia failed to make a case on which a reasonable finder of fact could have based a finding of either a section 2 violation or a breach of contract, for completeness we shall indicate briefly why, even if it had, the judgment could not be upheld. Olympia asked the jury to award damages of $54 million. This astonishing figure for an enterprise that was organized as a tax shelter, and when organized projected total profits over 10 years of only $1.4 million, was arrived at by assuming the following: had it not been for Western Union's allegedly unlawful conduct, Olympia would have bought from Teletype Corporation and leased to Western Union's telex subscribers 10,000 more terminals in the three years following its glorious burst of business in 1975 than it actually leased; these leases would have yielded over a further period of years income similar to that generated by the 1,800 leases that were installed; the equipment would then have been retired. The $54 million is the projected lease income on the entire 11,800 terminals, discounted to present value and net of the cost of buying and leasing the terminals. Since a terminal costs only $2,400, and since Olympia had as far as the record shows no substantial assets other than terminals, the projected net profit (discounted to present value) of $4,576 per terminal ($54 million divided by 11,800) translates into a rate of return on investment of 191 percent--this for a brand-new company that had virtually no assets, that depended on Teletype Corporation to sell it terminals and on Western Union to refer customers to it, and that never expected to lease more than 3,200 terminals.
 
 
 36
 The projection of lost profits that Olympia's expert witness made to the jury bore no relation to Olympia's internal business planning or to economic reality. Compare In re Innovative Construction Systems, Inc., 793 F.2d 875, 888-89 (7th Cir.1986). It is thus one more illustration of the old problem of expert witnesses who are "often the mere paid advocates or partisans of those who employ and pay them, as much so as the attorneys who conduct the suit. There is hardly anything, not palpably absurd on its face, that cannot now be proved by some so-called 'experts.' " Keegan v. Minneapolis & St. Louis R.R., 76 Minn. 90, 95, 78 N.W. 965, 966 (1899). See Albers v. Church of Nazarene, 698 F.2d 852, 858 (7th Cir.1983); Deltak, Inc. v. Advanced Systems, Inc., 574 F.Supp. 400, 405 (N.D.Ill.1983), vacated on other grounds, 767 F.2d 357 (7th Cir.1985); L. Hand, Historical and Practical Considerations Regarding Expert Testimony, 15 Harv.L.Rev. 40, 53 (1901). The expert in this case dazzled the jury with "an array of figures conveying a delusive impression of exactness," Herman Schwabe, Inc. v. United Shoe Machinery Corp., 297 F.2d 906, 912 (2d Cir.1962) (Friendly, J.); see Taylor v. Meirick, 712 F.2d 1112, 1119-22 (7th Cir.1983)--delusive because the figures had no relation to reality. If Olympia could earn a 191 percent return on investment simply by acting as a jobber of Teletype Corporation equipment to customers referred to it by Western Union, Western Union could earn a similar return by buying the same equipment from Teletype Corporation and leasing it to its telex customers directly; other vendors could do the same; and Teletype could cut out the middleman and sell its equipment to Western Union's subscribers directly and make a bundle doing so. A rate of return so far in excess of market rates of return would be a magnet drawing productive resources into the market--and confronting Olympia with competition from far more experienced firms.
 
 
 37
 Olympia argues that leasing telex equipment was a risky business because telex service had an uncertain future; and if subscribers cancelled the service and with it the equipment leases Olympia's profits would be much smaller than projected. In fact telex service has proved surprisingly durable but because (Olympia argues) this was not foreseen it would not have drawn other firms into the market. As Olympia's own evidence shows, however, many firms were active in this market in the late 1970s and competition among them would have knocked down the extravagant rates of return that its expert witness forecast.
 
 
 38
 The jury awarded the full $54 million asked for by Olympia, irrationally parcelling it out between the antitrust violations ($24 million) and the contract violation ($30 million). The district judge ordered a remittitur (which Olympia accepted) of everything over $12 million but gave no reasons for picking this figure. Just because $54 million is too much, it does not follow that $12 million is not too much. It still represents a huge rate of return on Olympia's projected investment--42 percent, contrary to all the probabilities. The record contains no basis for a rational estimation of Olympia's damages.
 
 
 39
 Speculation has its place in estimating damages, and doubts should be resolved against the wrongdoer. See, e.g., Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562-66, 51 S.Ct. 248, 250-251, 75 L.Ed. 544 (1931). But when a small, inexperienced firm created largely to exploit opportunities to save taxes extrapolates a multi-million dollar future from a few months of success, courts must be on guard against the more than possibility that the extrapolation ignores economic reality. Huge profits invite competition, to which Olympia was highly vulnerable, as its rapid exit from the market after only a few months of adversity demonstrates. There are no grounds for thinking it could have survived in this highly competitive market for 10 years while earning a 191 percent, or even a 42 percent, rate of return on its investment.
 
 
 40
 In any event there was no rational basis for the verdict on liability. The judgment of the district court is reversed with directions to enter judgment for Western Union.
 
 
 41
 REVERSED.