**KEY ENTERPRISES OF DELAWARE, INC., Plaintiff,**

v.

**VENICE HOSPITAL, et al., Defendants.**

No. 85–1074–Civ–T–15.

United States District Court,
M.D. Florida,
Tampa Division.

Jan. 19, 1989.

Christopher Kay, Orlando, Fla., for plaintiff.

Herbert T. Schwartz, Houston, Tex., for defendants.

## MEMORANDUM DECISION AND ORDER

CASTAGNA, District Judge.

The Court has for adjudication the defendants Venice Hospital, The Sammett Corporation (Sammett) and Medicare Patient Aid Centers' (MPAC)[1] motion for judgment notwithstanding the verdict, or for new trial, or for remittitur and the plaintiff's response. The defendants attack a jury verdict which found that they violated § 1 and § 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and tortiously interfered with a business relationship of the plaintiffs in violation of Florida state law.

### I. Factual Background

This case concerns the marketing of durable medical equipment (DME) to home users in the Venice, Florida area. DME includes prosthetic devices, hospital beds, oxygen equipment, wheelchairs, walkers and soft goods such as ostomy supplies, and dressings. DME suppliers rent and sell their products, and receive customers from many sources, including self-selection, referrals from hospitals, nursing homes and intermediate care facilities, home health agencies, physicians and physical therapists. The plaintiff, Venice Convalescent Aids Medical Supply (VCA), is one of several competing retailers of DME

---

1. These defendants will be collectively referred to as "the defendants."

to non-institutionalized patients in the Venice, Florida area. The defendant MPAC is also a DME supplier and is jointly owned by the other two defendants, Venice hospital, a Florida non-profit corporation, and the Sammett Corporation.

In May 1984, the defendant Sammett established the defendant MPAC to provide DME equipment to the Venice, Florida DME market. Also at this time, Venice hospital began investigating the possibility of establishing a home medical and supply business. Venice hospital contacted several pre-existing DME suppliers, including MPAC, regarding a possible joint venture.[2] Ultimately, in April 1985, a subsidiary of Venice hospital, Gulf Area Diversified Services (GADS), purchased from Sammett a one-half interest in Sammett's MPAC facility in Venice and thus established MPAC as a joint venture between Sammett and Venice hospital (the joint venture or, interchangeably, MPAC).

Before the joint venture, it was common practice in the Venice DME market for home health nurses to choose the DME vendor who would supply patients discharged from Venice hospital with their DME needs. The home health nurses had training in DME usage and were considered capable in selecting DME equipment for patients. The plaintiff concentrated its sales efforts on the home health nurses and consequently received most of its DME business from home health agencies and relatively little business from other available sources.

After the joint venture was created, Venice hospital instituted a new policy encouraging home health nurses to select MPAC as their DME supplier. This policy was instituted by the hospital and implemented through Mark Bowers, a MPAC employee. Bowers became the patient equipment coordinator in the Venice hospital's discharge planning department and his duties included meeting with many of the patients with anticipated needs for DME and organizing home treatment for patients. If a patient,

home health nurse or physician made a request for a particular DME vendor in a particular case, Bowers would honor that choice. However, in the absence of such a choice, Bowers referred all DME business to MPAC.

Plaintiffs contend that the creation of the joint venture and the attendant policy initiated by the defendants to refer all business to MPAC violate the antitrust laws. In their complaint, the plaintiffs alleged, among other things, that the defendants Sammett, Venice hospital, and MPAC violated § 1 and § 2 of the Sherman Act by coercing the home health agencies to refer all their patients to MPAC and by unreasonably restricting and excluding competition in the Venice DME market. The plaintiffs also alleged that the defendants had tortiously interfered with plaintiff's business relationship with the home health agencies.

After a three week trial, the jury, in answers to special interrogatories, found that (i) the defendants had violated § 1 of the Sherman Act by conspiring to deal exclusively with at least one home health agency (ii) that defendants violated § 2 of the Sherman Act by attempting to, and successfully, monopolizing the DME market in the Venice area (iii) that the defendants violated § 2 by conspiring to monopolize the Venice DME market (iv) that Venice Hospital violated § 2 by using its monopoly power to gain an unfair advantage in the DME market in Venice and (v) that the defendants tortiously interfered with plaintiff's business relationship with the home health agencies. The jury awarded the plaintiffs $760,983.00 in damages, which was duly trebled on the antitrust counts to $2,282,949.00. The defendants now ask the Court for a judgment notwithstanding the verdict, for a new trial or for remittitur.

II. Federal Antitrust Claims

Plaintiffs bring their federal antitrust claims under § 1 and § 2 of the Sherman

---

**2.** Although the plaintiff had not been contacted by the Venice hospital, VCA contacted the hospital and inquired into the possibility of a joint venture. The hospital declined, noting that it had already entered into a joint venture with MPAC.

Act, 15 U.S.C. §§ 1, 2.[3] The Court will consider plaintiffs' § 1 and § 2 claims collectively, however, since § 1 and § 2 forbid essentially the same conduct, except that § 1 "covers contracts, combinations, or conspiracies" while § 2 "is not restricted to conspiracies or combinations," but also prohibits monopolization and attempts to monopolize. *United States v. Griffith,* 334 U.S. 100, 106–07, 68 S.Ct. 941, 945–46, 92 L.Ed. 1236 (1948); *see also Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 767 n. 13, 104 S.Ct. 2731, 2739 n. 13, 81 L.Ed.2d 628 (1983). "[T]hose things which are condemned by § 2 are in large measure merely the end products of conduct which violates § 1." *Id. citing Standard Oil Co. v. United States,* 221 U.S. 1, 61, 31 S.Ct. 502, 516, 55 L.Ed. 619 (1911). Moreover, this is a particularly appropriate case to consider the federal antitrust claims as a group since the coercive behavior underlying the § 1 claim is precisely the same restrictive or exclusionary behavior which constitutes the § 2 violations.

Antitrust liability under both § 1 and § 2 requires a finding that the defendants or some of them engaged in unreasonably restrictive, exclusionary or coercive conduct toward the marketplace which caused injury to competition.[4] *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 600–02, 105 S.Ct. 2847, 2856–57, 86 L.Ed.2d 467 (1984) (Section 2); *United States v. Topco Associates, Inc.,* 405 U.S. 596, 606–07, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972) (Section 1); *United States v. Aluminum Co.,* 148 F.2d 416, 429–30 (2d Cir.1945) (Section 1); *Standard Oil v. United States,* 221 U.S. 1, 55–64, 31 S.Ct. 502, 513–517, 55 L.Ed. 619 (1911) (Section 1); *Mid–Texas Communication v. AT & T,* 615 F.2d 1372, 1387 (5th Cir.1980) (Section 2); *see generally* 3 P. Areeda & D. Turner,

*Antitrust Law,* § 825 (1978); 6 P. Areeda & D. Turner, *Antitrust Law,* § 1400c (1978).

■ The plaintiffs' claim of coercive or unreasonably restrictive or exclusionary conduct rests on the inferences that may be drawn from the following evidence: (1) Venice hospital entered the DME business by purchasing a ½ interest in MPAC; (2) thereafter, the hospital requested the home health nurses to use MPAC as their DME supplier; (3) MPAC, and derivatively Sammett, helped implement the policy encouraging the home health nurses to refer their DME patients to MPAC; (4) the home health nurse coordinators were guests in the hospital; (5) Bowers, an MPAC employee, was physically present in the hospital to implement the policy; (6) some home health nurses felt subjectively pressured to use MPAC; and (7) some, but not all, home health agencies decided to adhere to the hospital's policy. The issue for resolution is whether this evidence, and the inferences reasonably drawn therefrom, is sufficient as a matter of law to support a finding of prohibited antitrust behavior. The Court concludes that it is not.

Illustrative is *Bob Maxfield, Inc. v. American Motors Corp.,* 637 F.2d 1033 (5th Cir.1981) *cert. denied,* 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1981). In *Maxfield,* an automobile dealer brought a Sherman Act claim against an automobile manufacturer alleging that he was coerced by the manufacturer to accept unwanted big cars in order to obtain more desirable small cars. *Id.* at 1035–36. The trial court directed a verdict for defendants on the coercion claims and the fifth circuit affirmed. The appellate court found that coercion could not be established as a matter of law unless it was shown that the

---

**3.** Section 1 of the Sherman Act declares illegal "[e]very contract, combination ... or conspiracy, in the restraint of trade or commerce among the several States...." 15 U.S.C. § 1. Similarly, § 2 outlaws any activity by any "person who shall monopolize, or attempt to monopolize, or combine or conspire ... to monopolize any part of the trade or commerce among the several States...." 15 U.S.C. § 2.

**4.** Of course, under § 1 (as opposed to § 2), it is not necessary to show that the concerted activity threatens monopolization. *See Copperweld Corp. v. Independence Tube Corp,* 467 U.S. at 758, 104 S.Ct. at 2735. Nonetheless, there must be some unreasonable anti-competitive, exclusionary or coercive type conduct (i.e. some restraint of trade) present before a § 1 violation may be found. *Standard Oil v. United States,* 221 U.S. at 55–64, 31 S.Ct. at 513–517 (1911).

defendant *required* the plaintiff to take the large cars or face a cut-off of the small cars. *Id.* at 1037. The court noted that it was permissible for the defendant to vigorously persuade or encourage the plaintiff to accept the big cars without violating the antitrust laws as long as the encouragement fell short of an enforceable requirement. Important to the court's conclusion was: (1) there was no evidence that the defendant actually threatened the plaintiff with the explicit requirement; (2) at all times the plaintiff could and did resist the encouragement and did not lose its autonomy to act; and (3) the requirement was never actively enforced. *Id.* at 1037–38.

*Maxfield* is substantially similar to the facts presented in this case and indicates that defendants behavior, as a matter of law, was not unlawfully coercive. First, here as in *Maxfield*, there was no evidence that the defendants *required* the home health nurses to refer to MPAC or face a cut-off in patient referral from the hospital. Plaintiffs did offer testimony that the defendants forthrightly encouraged the nurses to refer to MPAC, but never was it shown, nor argued, that this encouragement reached the level of a mandatory requirement. And without evidence of a mandatory requirement, *Maxfield* dictates that the inference of antitrust coercion is impermissible as a matter of law.

Second, and again similar to *Maxfield*, the evidence here did not establish that the home health nurses ever lost their autonomy to act as a result of the alleged coercion. On the contrary, several home health nurses did, in fact, continue to use DME vendors other than MPAC and thus retained their autonomy to choose whichever DME supplier they wished. At best, some home health nurses felt subjectively pressured to recommend MPAC. But this is consistent with encouragement, not an enforceable requirement.

Moreover, the testimony of the home health nurses who did choose MPAC indicates that their choice was made not because the defendants coerced or forced them to do so, but because they thought it beneficial to their home health agency.

Thus, it was not the "veiled fist" of the defendants which motivated the home health nurses, it was instead their own self interest.

Finally, as in *Maxfield*, no evidence was presented that any of the defendants ever attempted to retaliate or enforce their policy in the face of non-compliance. The evidence in the best light for the plaintiff in this case was that the hospital encouraged, perhaps vigorously so, the home health nurses to order DME equipment from MPAC; however, if a home health nurse, patient or doctor decided to do otherwise, as many did, the hospital and Mark Bowers respected that choice and did not penalize anyone for their choice.

In sum, there simply is no "coercive" or "restrictive" link—no evidence of threats, of loss of autonomy, or of enforcement—between the fact that the hospital established a policy encouraging the home health nurses to select MPAC and the fact that some, though not all, home health nurses did so. Without such a link, *Maxfield* dictates that the inference of coercion is unreasonable as a matter of law. *Cf. Cia. Petrolera Caribe, Inc. v. Avis Rental Car Corp.*, 735 F.2d 636, 638 (1st Cir.1984).

Other indicators of unlawfully restrictive or exclusionary antitrust behavior are similarly absent in this case. To determine what is unreasonably exclusionary or restrictive, courts often consider whether the behavior is economically irrational or anti-competitive, whether the behavior has an exclusionary or restrictive impact on the patients (consumers), home health nurses, doctors and other DME suppliers and "whether [the conduct] has impaired competition in an unnecessarily restrictive way." *Aspen Skiing Corp. v. Aspen Highlands Skiing Corp.*, 472 U.S. at 605, 105 S.Ct. at 2859; *see also* 3 P. Areeda & D. Turner, *Antitrust Law* § 78 (1978).

■ An important indicator of unreasonably restrictive or exclusionary behavior is economically irrational or anti-competitive behavior. *See Aspen Skiing Corp. v. Aspen Highlands Skiing Corp.*, 472 U.S. at 605, 105 S.Ct. at 2859; *see also* R. Bork, *The Antitrust Paradox* 138 (1978). Such

conduct is often marked by predatory pricing or, as in *Aspen Skiing*, elimination of cooperation with a competitor requiring the voluntary loss of profits. In the instant case, however, the defendants' conduct was nothing more than ordinary, rational and profitable marketing practices. The defendants entered a joint venture and thereafter recommended, but did not require, that the home health nurses use the joint venture. Moreover, patients, doctors and home health nurses had the freedom to choose DME suppliers other than MPAC and the defendants respected that choice. In short, the Court can find none of the typical anti-competitive or economically irrational behavior that is normally associated with illegal antitrust behavior.

Behavior that restricts or inhibits the consumers' freedom to choose is indicative of unreasonably exclusionary conduct. *Aspen Skiing Corp. v. Aspen Highlands Skiing Corp.*, 472 U.S. at 605, 105 S.Ct. at 2859; *see, e.g., Satellite Financial Planning v. First Nat. Bank*, 643 F.Supp. 449, 452 (D.Del.1986). The focus on the consumer is significant because it illustrates a fundamental flaw in the jury's finding that the defendant's behavior was unreasonably exclusionary. Throughout its case and in argument to the jury, the plaintiff focused the inquiry on the effect the joint venture had on the home health nurses' ability to choose a DME vendor. But the home health nurses are not the consumers of the DME, the patients are. And it was stipulated and uncontradicted that the patient—the consumer—always had the freedom to choose any DME vendor he or she desired and that this freedom was not restricted. The defendants' behavior was not unreasonably exclusionary or restrictive vis-a-vis the consumer.

Moreover, to the extent that the home health nurses are important, the evidence was clear that the nurses could, and many did, continue to use any DME supplier they chose.[5] This is also true of the doctors who could and did choose DME vendors other than MPAC if they indicated such a choice on the patient's chart. The stark fact is that Venice hospital and MPAC never excluded or restricted the patients, the home health nurses or the doctors from choosing any DME supplier they desired. The defendants encouraged the choice of MPAC, but they did not exclude or restrict an alternate choice. Consequently, the defendants' behavior was not unreasonably exclusionary vis-a-vis the home health nurses or the doctors.

Similarly, other DME vendors were not unreasonably excluded or restricted from competing in the Venice DME market. It is important to remember that plaintiffs complain of being excluded from only *one* source of DME patients—referrals from Venice hospital. The plaintiffs by their own admission could compete for the DME patients coming from other sources, including street walk-ins, nursing homes, physical therapists and physicians. Plaintiffs thus had other competitive options in the DME market; merely because those options may have been unpalatable does not mean they were non-existent.[6] Accordingly, defendants' behavior, even if it was everything plaintiffs' alleged, did not unreasonably exclude other DME suppliers from continuing to compete in the Venice DME market.

The plaintiffs also argued that the Venice hospital's "no solicitation" rule demonstrated that other DME vendors were excluded from competition. But the uncontradicted facts indicated that the "no solicitation" rule was in effect before the joint venture and thus could not constitute evidence that the defendants behaved improperly after the joint venture was established. Moreover, it was stipulated that

**5.** *See supra,* p. 1517 (discussion of home health nurses' autonomy).

**6.** Indeed, the evidence indicated that plaintiffs did not even attempt to pursue other competitive options before filing this lawsuit. Plaintiffs did not seek to attract more walk-in customers by relocating their store, which was then locat-ed behind a dumpster and next to a bar. Nor did plaintiffs shift their marketing focus to nursing homes or physicians and physical therapists. Instead, plaintiffs passively waited for the telephone to ring, and when it did not, they were content to compete in the courtroom instead of the marketplace.

the defendants offered all hospital patients a choice of any DME supplier by providing, at the hospital's expense, a brochure to each patient needing DME listing all the local DME suppliers, including plaintiff. This gratuitous gesture went beyond defendants' obligation to plaintiffs,[7] see *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.,* 797 F.2d 370, 377–78 (7th Cir.1986), *cert. denied,* 480 U.S. 934, 107 S.Ct. 1574, 94 L.Ed.2d 765 (1987), and further indicates that the defendants did not go about to unlawfully exclude the plaintiffs from competition.

To be sure, MPAC was permitted some advantages other DME suppliers were not, but conduct is not unreasonably exclusionary or restrictive merely because it works to one competitors advantage or does not provide identical benefits to all competitors. Indeed, if that were the case, a hospital could never recommend an affiliated company when patients, doctors or home health nurses did not express a choice, nor could a hospital refer patients to specific doctors or establish exclusive contracts with pathologists or anesthesiologists. *Cf. Drs. Steuer & Latham v. Nat. Med. Enterprises,* 672 F.Supp. 1489 (D.S.C.1987) (exclusive contract between hospital and pathologists not violative of antitrust laws). This, of course, would be an anomalous result not mandated by the antitrust laws.

■ In sum, the underlying policy and purpose of the antitrust laws is to protect competition, not competitors. *See Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 110, 107 S.Ct. 484, 489, 93 L.Ed.2d 427 (1986); *N.C.A.A. v. Board of Regents of Univ. of Okla.,* 468 U.S. 85, 107–108, 104 S.Ct. 2948, 2963–64, 82 L.Ed.2d 70 (1984); *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50

L.Ed.2d 701 (1977); *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962). It follows, therefore, that liability under the antitrust laws results only when competition, rather that any specific competitor, is injured. *Id.; see also Cascade Cabinet Co. v. Western Cabinet & Millwork,* 710 F.2d 1366, 1373 (9th Cir.1983) ("economic injury to a competitor does not equal injury to competition.") In the present case, although the plaintiff, a specific competitor, was injured by the joint venture, competition as a whole was not. The defendants' conduct was economically rational, it did not exclude or restrict the freedom of the patients, home health nurses, or doctors to choose the DME vendor of their liking, nor did it unreasonably exclude other DME suppliers from competing in the DME market. Consumers did not complain about the joint venture, suppliers were not excluded from the market, prices actually dropped, and market concentration actually diminished. The evidence simply does not support a finding that defendants behavior was coercive or unreasonably exclusionary, or, in other words, that competition was injured. As a consequence, the jury's condemnation of defendants' behavior as illegal antitrust conduct was in error and its verdict on special interrogatories I, II, III[8], IV and V must be reversed.

### III. State Law Tortious Interference Claim

■ In special interrogatory VI, the jury found that the defendants MPAC and Venice hospital tortiously interfered with the plaintiff's business relationship with the home health agencies in violation of Florida state law. To establish this claim, Florida law requires the plaintiff to show: (1) the

---

**7.** The brochure also indicates that the defendants did not refuse to deal with the plaintiff; such a refusal is another indicator of unlawful exclusionary or restrictive behavior not present here. *See, e.g., Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. at 602–03, 105 S.Ct. at 2857–58; *Lorain Journal Co. v. United States,* 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951).

**8.** Although a § 2 conspiracy to monopolize claim does not require the showing of any af-

firmative antitrust behavior, *see United States v. Griffith,* 334 U.S. at 106–07 & n. 9, 68 S.Ct. at 945–46 & n. 9; 3 J. von Kalinowski, *Antitrust Laws and Regulation,* § 9.02(1)a (1981), such behavior was the only evidence plaintiffs offered in support of their conspiracy to monopolize claim. Because the Court has found above that the defendants' behavior did not violate the antitrust laws, the plaintiffs' § 2 conspiracy to monopolize claim must also fail.

**1520**

existence of an advantageous business relationship; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; (4) damage to the plaintiff. *Tamiami Trail Tours, Inc. v. J.C. Cotton*, 463 So.2d 1126, 1127 (Fla.1987). Florida law defines an unjustified interference as one made to cause injury, made out of spite, or made as the result of illegal conduct (such as antitrust behavior) or threats. *See Jury Instructions* at D–125 p. 85. Conversely, an interference is justifiable if it has a legitimate business purpose other than interfering with plaintiff's business relationship. *Id.*

The record evidence, taken in the light most favorable to the plaintiff, does not support the inference that the defendants' interference was unjustifiable. Indeed, as the Court has found above, the evidence in its best light to plaintiffs indicates that the defendants did no more than encourage the home health nurses to use MPAC, that this was reasonable business behavior motivated by economical considerations, and that this activity did not constitute illegal antitrust behavior. Without the presence of illegal antitrust behavior, a major predicate for an unjustified interference is lost. *Id.* And, in fact, this loss is fatal to the interference claim since plaintiffs did not establish, nor allege, that the interference was grounded in spite or in a specific intent to cause plaintiff injury—the other possible predicate conduct underlying a unreasonable interference. Consequently, the evidence does not support the inference that the defendants unjustifiably interfered with the plaintiff's business relations and the jury's verdict in special interrogatory VI must be reversed.

### IV

The plaintiff has also filed a motion for attorneys fees and costs. Because of the disposition of the defendants' motion for judgment notwithstanding the verdict, this motion must be denied.

\*    \*    \*    \*    \*    \*

For the reasons stated, it is

ORDERED:

1. That the defendants' motion for judgment notwithstanding the jury's verdict (D–135) is GRANTED and the clerk is directed to enter judgment notwithstanding the jury's verdict in favor of all defendants and against plaintiffs on all claims made by plaintiff.

2. That the defendants' alternative motion for a new trial is DENIED.

3. That the plaintiff's motion for attorney fees and costs is DENIED.

DONE AND ORDERED.